IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| RICHARD WEIDMAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:13-cv-501 |
| | ) | |
| | ) | |
| EXXON MOBIL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment.

Richard Weidman ("Plaintiff") is a physician who the Defendant ExxonMobil ("Defendant") employed for approximately five years as the manager of the occupational medical clinic at its Fairfax campus. Defendant has a global health department called Medicine and Occupational Health ("MOH") that provides global occupational and public health services to all ExxonMobil employees.

On March 26, 2013, Plaintiff filed suit against Defendant and ten additional individual Defendants, all employees of ExxonMobil. The Complaint alleged four counts: (i) fraud; (ii) intentional infliction of emotional distress; (iii) personal

injury; and (iv) wrongful discharge. On April 30, 2013, Defendants moved to dismiss the entire Complaint.

In an Order and Memorandum Opinion dated August 1, 2013, this Court granted Defendants' Motion to Dismiss, holding that Plaintiff failed to state a claim for which relief may be granted on each of his claims. In dismissing the wrongful discharge claim, this Court held that "Plaintiff failed to identify the public policy statute that ExxonMobil violated in discharging him from employment, and in allegedly operating illegal pharmacies, and thus did not remotely establish that his termination falls within the public policy exception."

Plaintiff appealed this decision, and the Fourth Circuit affirmed this Court's dismissal of all claims except for the wrongful discharge claim. The Fourth Circuit held that Plaintiff had sufficiently stated a claim for wrongful discharge under the theory that he was fired for refusal to engage in a criminal act – his alleged "refusal to practice pharmacy without a license" in violation of the public policy of sections § 54.1-3310 and § 54.1-3435 of the Virginia Code. The Fourth Circuit found that, while Plaintiff did not cite these statutes in his Complaint, his citation to them in his opposition brief was sufficient.

As a result, Plaintiff's sole claim remaining before this Court is a claim for wrongful discharge on the theory that he

2

was fired for refusing to "practice pharmacy."

On October 1, 2007, Defendant hired Plaintiff as a physician and clinic manager. In this position, Plaintiff was responsible for providing occupational health services and supervising the medical clinic at Fairfax, Virginia. For the first few years of his career with Defendant, Plaintiff managed two other ExxonMobil clinics in Clinton, New Jersey and Paulsboro, New Jersey.

In June or July of each year, the MOH supervisors come together to discuss the performance of MOH employees. During this meeting, employees are competitively ranked amongst their peers, with each employee being given a ranking from 0 to 99, with 0 being the lowest performer and 99 being the top performer. Because they are new to the job, first-year employees are not competitively ranked and, thus, are given an "in the middle" ranking of 50. The following year, however, the new employee is competitively ranked.

In or around October of each year, the supervisor meets with the employee and provides him or her with an oral evaluation of that employee's performance. Employees are not told their exact ranking, with the exception that employees in the bottom 10% are typically informed of their ranking for the purpose of Performance Improvement Plans ("PIP"). In the June or July 2009, Plaintiff was competitively ranked against his peers

3

for the first time. He was given a ranking of 11, just on the cusp of the bottom 10% when compared against his peers.

In mid-2009, when the H1N1/09 virus was declared by the World Health Organization as a "pandemic," Dr. Stephen Jones, an ExxonMobil physician based in the United Kingdom, and Plaintiff's second-level supervisor, assisted with the development of ExxonMobil's pandemic flu response. The Defendant's pandemic flu response included a plan that would have Tamiflu available at ExxonMobil clinics for lawful distribution to personnel performing critical operations in the event of an emergency.

In or around June 2009, it was discovered that there may be state laws affecting Defendant's ability to store and distribute Tamiflu. As such, Defendant began reviewing the legal implications of the program. In or around November 2009, Plaintiff claims he received a letter from the Virginia Board of Pharmacy ("Board") informing him that it would be conducting an audit of the Fairfax clinic's pharmacy operations. Plaintiff then alleges he anonymously called the Board "trying to find out whether it was a legal operation or not." He claims he asked the Board "general information about . . . how one could operate a pharmacy operation." Based on that conversation, Plaintiff came to the conclusion that "the whole operation of dispensing medication to employees" was unlawful.

Plaintiff alleges he "immediately" told the Fairfax clinic's nurse, Kathy Ludwig, to cease dispensing medication at the clinic. Plaintiff then placed a second call to the Board, informing it that the pharmacy is closed so there was no need to conduct an inspection. The Board's audit of the Fairfax clinic was then cancelled.

On December 31, 2009, Plaintiff sent an e-mail to his supervisor, Glen Douglas, M.D., and Margaret Carlson, another MOH administrative employee, pertaining to Tamiflu storage as part of the Defendant's pandemic flu response. Following the correspondence, the Tamiflu supply was removed from the Fairfax clinic and "that was the end of it." As stated by the Plaintiff, "[a]s I recall, it was not brought up again." Defendant states that neither Dr. Jones nor any other ExxonMobil manager took issue with Plaintiff's decision not to dispense medication or store Tamiflu at the Fairfax clinic.

In or around June 2010, Victoria M. Weldon, M.D., U.S. Occupational Health Manager, became Plaintiff's direct supervisor. In taking over as Plaintiff's supervisor, Dr. Weldon identified a number of performance-related issues. Dr. Weldon states that while Plaintiff was good at providing one-on-one physician care, he struggled with the management and administrative side of occupational medicine. Dr. Weldon found that, although he had been with the Company for over two years,

he had little understanding of management functions, processes, and the expectations for his role. She also discovered there were issues with Plaintiff's attendance. While Dr. Weldon was physically located in Houston, she received reports that Plaintiff was often late or would leave the clinic without finding proper physician coverage. Additionally, Dr. Weldon observed that Plaintiff seemed to have difficulty with interpersonal relations, particularly when collaborating with colleagues.

Given these performance issues, as well as the fact that Plaintiff still had not obtained his New Jersey medical license, Defendant removed his management responsibilities over the two New Jersey clinics. This resulted in him having the smallest workload of any Clinic Manager in the country.

In June 2010, annual ranking meetings were held, and Plaintiff was ranked in the bottom 10%. On October 12, 2010, Dr. Weldon met with Plaintiff to deliver his annual evaluation. During this meeting, Dr. Weldon relayed to Plaintiff that his relative performance continued to be low and that he was now ranked in the bottom 10%. Additionally, Dr. Weldon told Plaintiff that he would be placed on a PIP, which is typical for employees in the bottom 10%.

Over the next several months, Dr. Weldon worked with Human Resources to develop a PIP for Plaintiff. Just before

6

Defendant was to present Plaintiff with the PIP, Dr. Weldon was advised that an investigation was being initiated to address complaints Plaintiff had recently brought forward.[1] On advice of Human Resources, Dr. Weldon postponed issuing the PIP until Plaintiff's complaint could be investigated.

In April 2011, Defendant concluded its investigation of Plaintiff's January 2011 complaint. Given that the annual evaluation and rankings were approaching, it was decided to hold off on issuing to Plaintiff the previously drafted PIP.

Over the next several months, Dr. Weldon continued to receive reports that Plaintiff was late to work, did not arrange for adequate coverage when he was absent, among other issues. Additionally, in August 2011, Dr. Weldon learned that only two U.S. based employees in the MOH department had failed to complete mandatory trainings – Plaintiff and his direct subordinate, Kathy Ludwig.

In June or July 2011, Plaintiff was again ranked in the bottom 10% when compared to peer employees. Several months later, in October 2011, Dr. Weldon met with Plaintiff for his annual evaluation and relayed this bottom 10% ranking to him.

---

[1] In January 2011, Plaintiff reported to Defendant's senior management that the head of MOH, Clarion Johnson, M.D. was retaliating against him for his prior complaints and that i) Defendant was violating Pharmacy laws in several states, ii) Dr. Johnson and the Defendant's medical department were knowingly permitting the legal violations to occur, and iii) Dr. Johnson had withheld information from corporate headquarters that a nurse had been terminated for falsifying medical records. Following an investigation, Plaintiff was advised that there was no evidence to substantiate his claims.

Again, Plaintiff was told that he would be placed on a PIP.

On October 27, 2011, Dr. Weldon and her supervisor, Dr. Jones, met with Plaintiff and issued him a PIP. During the meeting, Dr. Weldon provided Plaintiff with a number of areas in which he needed to improve, citing specific examples. Moreover, the PIP itself outlined the Defendant's expectations for Plaintiff. The following day, October 28, 2011, Dr. Weldon met privately with Plaintiff to discuss a few items that she discovered during her site visit to the Fairfax clinic. This time, without a witness present, Plaintiff allegedly began arguing with his superior in what she considered to be an unprofessional and hostile manner.

Over the next several months, Dr. Weldon continued to receive a number of complaints concerning Plaintiff. These complaints came from employees within the clinic, including the Physician's Assistant, Administrative Assistant, as well as Human Resources employees who interfaced with Plaintiff on occupational health issues. In January 2012, Plaintiff made a second complaint to company officials.[2] As a result, the PIP issued to him in October 2011 was placed on hold until the complaint could be investigated.

---

[2] In January 2012, Plaintiff made a second complaint that i) Dr. Johnson and others had retaliated against him for earlier complaints about the pharmacy operations, and ii) there had been a "cover up" of these illegal activities during the investigation of his prior complaint. Plaintiff was advised that there was no evidence to support his claims.

In or around June 2012, Plaintiff was ranked in the bottom 2%. On June 27, 2012, Dr. Weldon, along with Human Resources Advisor Meghan Hasson and Dr. Jones, met with Plaintiff and placed him on a second PIP. The PIP outlined various performance expectations for Plaintiff for the next six months. On October 24, 2012, Dr. Weldon met Plaintiff for his annual evaluation. In this discussion, Dr. Weldon told Plaintiff that he "continues to be in the bottom 10%" and "[d]espite performance coaching, relative to his peers, he is unable to effectively and independently manage beyond the individual patient."

Plaintiff claims to have suffered a heart attack either during or a short time before or after this meeting. While the timing of his heart attack is disputed, it is undisputed that at no point during this meeting, or any time before his employment termination, did Plaintiff tell his supervisors that he had, or was having, a heart attack. As a result, Plaintiff was absent from work for over two months during the six month PIP period. Given this significant absence, Defendant decided to extend the PIP and adjust deadlines therein.

On December 12, 2012, Dr. Weldon and Ms. Hasson met with Plaintiff and told him that his PIP would be extended with updated deadlines and assignments to accommodate his absences and provide him with the opportunity to demonstrate sustained

9

and acceptable performance. When told that the PIP was being extended, Plaintiff, according to Dr. Weldon and Ms. Hasson, continued the argumentative and insubordinate behavior that he had exhibited in previous meetings. Dr. Weldon and Ms. Hasson attempted to calm the situation and explain to Plaintiff that this was not a "new" PIP, but was an extension of the previous PIP to allow for adjustment of the previous deadlines given his extended absences. Despite these attempts, Plaintiff allegedly continued being loud, argumentative, and hostile. After approximately ten minutes, Ms. Hasson ended the meeting early because it was not progressing in a productive and constructive manner.

Plaintiff does not "remember everything that was said in that meeting," but concedes that portions of his supervisor's recollection of the meeting are "accurate." Plaintiff also testified, "I will say I will agree that I was upset. I was upset because I – this was getting to be utterly outrageous keeping this PIP going . . ." When asked to describe his behavior in the meeting, Plaintiff testified that he was "emphatic in defending myself."

Following the December 12, 2012 meeting, Dr. Weldon and Ms. Hasson wrote statements detailing Plaintiff's behavior during the meeting. The matter was then discussed with other members of ExxonMobil's Human Resources and Law departments.

Collectively, it was decided to recommend that Plaintiff be terminated because of his continued poor performance and refusal to participate in the performance improvement process.

Because the Global Director of MOH, Clarion Johnson, M.D., had been the subject of Plaintiff's previous internal complaints, Dr. Johnson was removed from the decision-making process regarding Plaintiff's personnel matters. Instead, the recommendation to terminate Plaintiff's employment was presented to then Vice President of Safety and Security, Jeffrey Woodbury, per typical protocol. Mr. Woodbury endorsed the recommendation and authorized Plaintiff's dismissal.

On January 22, 2013, Dr. Jones and Ms. Hasson met with Plaintiff and terminated his employment. While separations are typically conducted by direct supervisors, Dr. Weldon was not present during the termination meeting due to earlier safety concerns.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings and evidence before the Court show no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is not a "disfavored procedural shortcut, but rather [an] integral part of the Federal Rules ... which are designed to 'secure the just,

speedy, and inexpensive determination of every action.'" Id.
While the Court will view the facts and inferences drawn in the
light most favorable to the nonmoving party, the party opposing
the motion for summary judgment must put forth specific facts
showing a genuine issue for trial. Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986). "[I]t is ultimately the
nonmovant's burden to persuade us that there is indeed a dispute
of material fact. It must provide more than a scintilla of
evidence—and not merely conclusory allegations or speculation—
upon which a jury could properly find in its favor." Design
Res., Inc. v. Leather Indus. Of Am., 789 F.3d 495, 500 (4th Cir.
2015) (citations and quotations omitted).

Virginia adheres to the employment at-will doctrine, which
permits either party in an employment relationship to terminate
the relationship at its discretion at any time, for any reason.
Miller v. SEVAMP, Inc., 234 Va. 462 (1987). In the landmark
Bowman decision, the Virginia Supreme Court recognized a "narrow
exception" to the at-will rule "limited to discharges which
violate public policy, that is, the policy underlying existing
laws designed to protect the property rights, personal freedoms,
health, safety, or welfare of the people in general." Id. at
467-68; see also Bowman v. State Bank of Keysville, 229 Va. 534,
540 (1985).

Virginia courts have consistently emphasized the narrow

and restrictive application of this public policy exception in the thirty-one years since the Bowman decision. See, e.g., Miller, 234 Va. at 468 (holding that the exception is "not so broad as to make actionable those discharges of at-will employees which violate only private rights or interests"); Mitchem v. Counts, 259 Va. 179, 190 (2000) ("We have narrowly construed the public policy exception to [the at-will employment] doctrine, and we have applied that exception in few instances."); Dray v. New Mkt. Poultry Prods., Inc., 258 Va. 187, 191 (1999) (refusing to recognize common-law "whistleblower" retaliatory discharge exception to the employment-at-will doctrine); Leverton v. AlliedSignal, Inc., 991 F. Supp. 486, 493 (E.D. Va. 1998) (Payne, J.) ("the Supreme Court of Virginia has been at considerable pains to tightly restrict" the Bowman doctrine).

The Supreme Court of Virginia has recognized three very narrow circumstances in which a plaintiff may assert a wrongful discharge claim: (1) where an employer fires an employee for exercising a statutorily created right; (2) when the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy"; and (3) "where the discharge was based on the employee's refusal to engage in a criminal act." Rowan v. Tractor Supply Co., 263 Va.

13

209, 214 (2002) (emphasis added).

The wrongful discharge theory asserted by Plaintiff – that he was fired for refusing to commit a crime – was first recognized by the Virginia Supreme Court in Mitchem v. Counts. In Mitchem, the plaintiff alleged that her male employer wrongfully discharged her for refusing to engage in sexual relations with him. Mitchem, 259 Va. at 183-84. The plaintiff alleged that the requested sexual behavior was a violation of the Virginia criminal code and that she was fired for refusing to engage in this criminal behavior. Id.

The employer filed a demurrer as to the wrongful discharge claim, which the trial court sustained on the ground that the aforementioned criminal code provisions "do not articulate public policies that will support a common law action for wrongful termination." Id. at 184. The Virginia Supreme Court reversed, holding that the public policies embodied in criminal statutes were sufficient to plead a Bowman claim. Id. at 190. The Court found that "the General Assembly did not intend that the employment-at-will doctrine . . . serve as a shield for employers who seek to force their employees, under the threat of discharge, to engage in criminal activity." Id.

As set forth below, Plaintiff cannot establish this claim for two independent reasons. First, Plaintiff has no evidence that he was "asked or directed" or "forced" to commit the

14

criminal actions prohibited by Virginia Code Sections 54.1-3310 and 54.1-3435. Second, Plaintiff has no evidence that he was actually fired for refusing to commit a crime, as opposed to being fired for other performance-based reasons.

To establish a wrongful discharge claim under Mitchem, Plaintiff must show that Defendant "asked or directed [him] to commit criminal acts." Scates v. Shenandoah Mem'l Hosp., 2015 WL 6143457, at *11 (W.D. Va.); see also Twigg v. Triple Canopy, Inc., 2010 WL 2245511, at *3 (E.D. Va.) ("To meet the third exception of Rowan, Plaintiff must show that he could have been prosecuted under Virginia criminal law had he engaged in the conduct demanded by his employer.").

Courts have routinely dismissed wrongful discharge claims when plaintiffs have either not pled, or have no evidence supporting, that they were asked or directed by their employer to commit a crime. See, e.g., McFarland v. Virginia Ret. Servs. of Chesterfield, L.L.C., 477 F. Supp. 2d 727, 736 n.4 (E.D. Va. 2007) (dismissing wrongful discharge claim because plaintiff cannot establish that she was "asked to break the law"); Scates, 2015 WL 6143457, at *11 (dismissing wrongful discharge claim because plaintiff "fails to allege any facts to show that [the defendant] asked or directed her to commit criminal acts"); Twigg, 2010 WL 2245511, at *3 (dismissing wrongful discharge claim because plaintiff failed to show that

15

he could have been prosecuted in Virginia for actions that occurred outside of the state); Dunn v. Millirons, 2016 WL 1299019, at *5 (W.D. Va.) (dismissing wrongful discharge claim where plaintiff "cites to no evidence suggesting that he was asked to participate in the alleged criminal conduct.")

Here, like the plaintiffs in the above-cited cases, Plaintiff simply has no evidence that he was "asked or directed to commit criminal acts." Plaintiff's Complaint refers to two allegedly unlawful acts: (i) dispensing of medications in the Fairfax clinic; and (ii) stockpiling of Tamiflu.

With regard to medication dispensing, there is no evidence that Plaintiff was "asked or directed" or "forced" to commit criminal acts. According to Plaintiff, on or around November 2009, he received a letter from the Virginia Board of Pharmacy requesting an audit of the Fairfax clinic. Plaintiff claims that he called the Board of Pharmacy, asked its representative a series of questions, and then determined, on his own accord, that medications should not be dispensed from the clinic. He then immediately ceased the practice without any objection or obstruction from Defendant.

Plaintiff claims that he discovered an illegal practice and promptly stopped it. There is no evidence that the Defendant "asked or directed" Plaintiff to continue dispensing medications or otherwise knowingly participate in any unlawful

16

activities. Further, there is no evidence to support that ExxonMobil supervisors were resistant to Plaintiff's desire to cease medication dispensing.

With regard to the alleged Tamiflu stockpiling, Plaintiff claims that one of his ExxonMobil supervisors, Dr. Stephen Jones, requested that he "participate in a scheme involving a Virginia pharmacy, in which the pharmacy would distribute the stockpiled medication to ExxonMobil employees." Defendant has produced this precise communication from Dr. Jones and it does not evidence any request to commit criminal acts. In this e-mail correspondence, Dr. Jones asked Weidman to investigate whether Defendant could store Tamiflu at an outside pharmacy for distribution in the event of a flu pandemic. As evident from the language of this e-mail, Dr. Jones was merely asking that Plaintiff look into whether this action was feasible. If it was not feasible, then, as stated in the e-mail, Dr. Jones wanted the Tamiflu supplies shipped back to Houston. There was no direction, instruction, or insistence that Plaintiff break the law.

It is also noteworthy that Plaintiff has not produced any evidence that Defendant violated any pharmacy laws. Even if Plaintiff had such evidence, it has no bearing on whether he can establish a wrongful discharge claim because "an employer's violation of a criminal statute did not *ipso facto* state a

17

Bowman claim." See Rowan v. Tractor Supply Co., 2001 WL 35840128, at *10 (W.D. Va. 2001) certified question answered, 263 Va. 209 (2002); Warner v. Buck Creek Nursery, Inc., 149 F. Supp. 2d 246, 263 (W.D. Va. 2001) (rejecting Plaintiff's attempt to prove wrongful discharge claim using criminal statutes "to show that the defendants engaged in illegal conduct, not to show that he engaged in protected activity for which he was fired.") Moreover, any violations occurring outside of the Commonwealth of Virginia and otherwise not connected to the Commonwealth cannot serve as the basis for a wrongful discharge claim based on Virginia public policy. Twigg, 2010 WL 2245511, at *5.

Plaintiff further fails to show evidence that his firing in 2013 was motivated by his alleged refusal to practice pharmacy over three years earlier. In carving out this exception to Virginia's strong presumption of at-will employment, the Court in Mitchem sought to prevent the employment at-will doctrine from "serv[ing] as a shield for employers who seek to force their employees, under the threat of discharge, to engage in criminal activity." Mitchem, 259 Va. at 190.

When viewing the facts in the light most favorable to Plaintiff, there is no evidence that Defendant forced Plaintiff, "under the threat of discharge, to engage in criminal activity." See id. at 190. Nor is there any evidence that his

employment was terminated "on account of his refusal to engage in a criminal act." Storey v. Patient First Corp., 207 F. Supp. 2d 431, 453 (E.D. Va. 2002).

In fact, there is ample evidence showing that Plaintiff was fired for legitimate, non-retaliatory reasons – his sustained poor performance and refusal to participate in the PIP process. The record shows that Plaintiff's performance did not meet Defendant's legitimate expectations for years prior to his firing. Importantly, these performance issues pre-dated his alleged November 2009 refusal to practice pharmacy. In mid-2009, Plaintiff was, for the first time, competitively ranked against his peers pursuant to Defendant's annual performance evaluation and ranking system. Months before his alleged refusal to practice pharmacy, Defendant ranked Plaintiff in the 11th percentile on a scale of 0 to 99, with zero being the lowest. Plaintiff's supervisors noted that, while he had satisfactory clinical skills, he struggled with the administrative and management aspects of occupational medicine. Plaintiff's poor rankings continued throughout his employment with him being ranked in the bottom 10% for the remainder of his career.

The record is clear – Defendant terminated Plaintiff's employment for legitimate, non-retaliatory reasons that had no relation to his claimed refusal to practice pharmacy.

Another important consideration is the fact that there is

no temporal proximity between Plaintiff's alleged refusal to commit a crime and the termination of his employment over three years later. Defendant continued to employ Plaintiff, paying him hundreds of thousands of dollars, while investing a significant amount of time and energy into training him and attempting to improve his performance.

In the retaliation context for employment discrimination and retaliation claims, the Fourth Circuit requires a temporal proximity of no more than a few months between the protected activity and retaliatory act. See, e.g., Pascual v. Lowe's Home Centers Inc., 193 Fed. Appx. 229, 233 (4th Cir. 2006) (holding that a three-or-four month gap is too long to support a causal connection); King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (noting that a gap of two months and two weeks is "sufficiently long so as to weaken significantly the inference of causation between the two events").

Here, Plaintiff is asking that the Court take a quantum leap to find a causal connection between his alleged refusal in November 2009 and separation in January 2013. If anything, by itself, this three year period is strong evidence that his employment was not terminated for retaliatory reasons.

The record fails to establish any evidence to support a claim that Plaintiff's employment was terminated for his refusal to commit a crime. Rather, the evidence establishes

20

that Plaintiff was discharged for his continued performance problems and refusal to cooperate in the PIP process.

Plaintiff has filed a Motion to Reconsider this Court's Order dated July 1, 2016 entitling the Defendant to Summary Judgment. In light of this opinion, the Motion to Reconsider should be denied.

For the foregoing reasons, Defendant's Motion for Summary Judgment should be granted.

An appropriate order shall issue.

_Claude M. Hilton_

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
July 26, 2016